UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| 7-ELEVEN, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 14-12676-MGM |
| MOHINDER GREWAL, | * |
| GREWAL CORPORATION, | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER REGARDING THE
PARTIES' CROSS-MOTIONS FOR PRELIMINARY INJUNCTION
(Dkt. Nos. 9 and 22)

November 20, 2014

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

The 7-Eleven Corporation ("7-Eleven") entered into a franchise agreement with the "Grewal Corporation," owned by Mohinder Grewal ("Mrs. Grewal"), in 2005. Through an internal investigation, 7-Eleven determined that Mrs. Grewal and her husband, Mann Grewal ("Mr. Grewal"), president and director of the Grewal Corpration (collectively "Defendants"), engaged in a scheme to deprive 7-Eleven of significant profits. Specifically, 7-Eleven estimates that 18% of all transactions were conducted fraudulently between approximately January and June of 2014. As a result, 7-Eleven delivered a non-curable notice of Material Breach and Termination of the Franchise to Defendants in June of 2014.

When Defendants refused to vacate the premises and continued to operate a convenience store using 7-Eleven's marks, 7-Eleven filed a complaint in this court requesting injunctive relief and monetary damages. 7-Eleven then moved for a preliminary injunction to prevent Defendants from

continuing to use its marks and to enforce the Franchise Agreement's post-termination non-compete clause. Defendants subsequently filed a motion for preliminary injunction, requesting the court to order 7-Eleven to reinstate their privileges under the Franchise Agreement. An evidentiary hearing for both motions took place on September 23, September 29, and October 30, 2014.

For the reasons set forth below, the court grants 7-Eleven's request for injunctive relief with respect to trademark infringement, and denies 7-Eleven's request with respect to enforcement of the non-compete clause. The court denies Defendants' motion for preliminary injunction in its entirety.

## II. FACTUAL FINDINGS

(1) <u>Franchise Agreement</u>

7-Eleven is an operator and franchisor of convenience stores, operating 50,000 stores worldwide. 7-Eleven also owns a number of widely-advertised federally-registered trademarks and service marks. By written franchise agreements, 7-Eleven licenses the use of its marks and its system to others, requiring these franchisees to operate uniformly and in accordance with 7-Eleven's specifications.

Mrs. Grewal is the owner of the Grewal Corporation, of which her husband, Mr. Grewal, is the president and director. On December 2, 2005, 7-Eleven entered into a Franchise Agreement with Mrs. Grewal.[1] Through this agreement, 7-Eleven agreed to sublease the "Store 22398" premises, located at 539 Pleasant Street in Holyoke, Massachusetts, to Defendants. Pursuant to its obligations under the agreement, 7-Eleven installed the standard equipment necessary for the operation of a 7-Eleven convenience store franchise (grills, soda fountains, etc.).

Defendants have paid over one-hundred thousand dollars in costs associated with starting their 7-Eleven franchise business. For at least several years, Defendants legitimately operated a store that performed well, as it regularly registered average sales numbers which, as 7-Eleven's witnesses

---

[1] This agreement was later amended, so that the Grewal Corporation would technically run Defendants' 7-Eleven franchise.

acknowledged, is an impressive feat given its location.[2] Throughout this period, per their agreement, Defendants paid 7-Eleven approximately half of their sales profits.[3] These profits are measured and calculated by the use of 7-Eleven's "Point of Sale" ("POS") system, which records inputs from cash register transactions.

(2) 7-Eleven's Investigation

In early 2014, 7-Eleven's asset protection team noticed that the "price lookup" function of Store 22398's registers were being utilized considerably more than the usual amount, across 7-Eleven's other stores.[4] As a result, 7-Eleven's asset protection team, led by Corporate Investigator Michael Aldridge ("Aldridge"), initiated an investigation. As Aldridge explained, the team analyzed many hours of security footage and concluded that approximately 18% of transactions viewed were conducted fraudulently. After carefully considering the evidence presented at the three-day preliminary injunction hearing, the court credits 7-Eleven's assessment of Defendants' impermissible activity between February and June of 2014.

7-Eleven's investigation revealed that these "price lookup" inquiries increased during overnight hours, thereby correlating with the times during which Mr. and Mrs. Grewal would work at the store. Additionally, the footage showed Mr. and Mrs. Grewal extensively using the "grocery non-tax" and "beer non-tax" keys on the register.[5] As Mr. Aldridge explained at the hearing, the "grocery non-tax" key serves to charge a customer for a non-taxable item that contains no uniform product code and cannot be scanned, such as a piece of fruit. Despite their knowledge of the key's intended purpose, however, the store's surveillance footage revealed that Mr. and Mrs. Grewal would regularly use this register function to erroneously ring up items that were, in fact, scannable. .

---

[2] Defendants did, however, testify about a dispute with 7-Eleven regarding whether Store 22398 should be required to carry certain items. 7-Eleven does not deny the existence or nature of this dispute. The court does not find this dispute relevant to the issue of motive for the termination of agreement or any other aspect of the pending motions.
[3] 7-Eleven does not, however, take a portion of profits obtained from alcohol sales.
[4] The "Price Lookup" function causes the price of an item to display without recording a sale.
[5] Mr. Aldridge explained that Store 22398 registered 11,000 of these three types of transactions during the investigatory period.

3

When an item is not scannable, the clerk must enter its price into the POS system manually. Therefore, due to the relatively excessive use of this key at Store 22398, it is likely that Defendants have been using this key to enter incorrect prices for items, and have been keeping for themselves the difference between the price entered and the payment received.

Further, the normal purpose of the "beer non-tax" key is to ring up a purchase of an alcoholic beverage, for which 7-Eleven does not share in the profits. For that reason, when this key is used to ring up a non-alcoholic item, 7-Eleven is deprived of its deserved profits from that item. The surveillance footage presented to the court by 7-Eleven also displayed many instances in which Mr. and Mrs. Grewal rang up non-alcoholic items using the "beer non-tax" key; thereby constituting further evidence of impermissible activity under the Franchise Agreement, which requires the Grewals to prepare and furnish accurate sales data to 7-Eleven, among other obligations.[6]

Defendants' fraudulent behavior frequently correlated with a nightly shutdown in the security camera directly above the register, taking place at times during which Mr. or Mrs. Grewal would work at the store. Analysis of the footage from a camera that continued to function, which displayed a view of the front of the register, revealed that before his shift each night, Mr. Grewal would routinely walk into the back office which contains the camera controls. Moments later, the camera above the register would go offline.[7] This occurred many times between February and June of 2014. In late June, however, the frequent camera shut-downs ceased. This cessation directly coincided with Defendants' receipt of 7-Eleven's "Non-Curable Notice of Material Breach and Termination," dated June 26, 2014.

---

[6] Through its documentary submissions, 7-Eleven claimed that it calculated a shortage of $131,316.44 in cigarette inventory at Store 22398 over an 18-month period ending on March 31, 2014. At the evidentiary hearing, however, 7-Eleven did not present sufficient evidence to corroborate this claim. Therefore, the court will not consider this unsubstantiated allegation in its ruling.

[7] Mr. and Mrs. Grewal claimed they had no idea how to control or operate 7-Eleven's camera surveillance system, thereby denying any allegations pertaining Mr. Grewal's having tampered with it. The court did not find this testimony to be credible when considered against the numerous video clips, indicating the camera in question would routinely shut down immediately after Mr. Grewal would enter the office.

This termination notice identified several breaches, the most significant of which was Defendants' alleged "engage[ment] in a pervasive, fraudulent scheme of incorrectly ringing and failing to ring customer transactions." It discussed instances of specific conduct, upon which the decision to terminate the agreement was based, and it cited Defendants' willful abuse of the franchisor-franchisee relationship.[8] Through this notice, 7-Eleven declared the Defendants' sublease and equipment lease to be terminated. It further demanded that Defendants comply with their post-termination obligations under the Franchise Agreement, including no longer using 7-Eleven's marks after termination and not operating a convenience store in the location of a former 7-Eleven franchise for one year after termination.

In spite of this notice and corresponding demand, however, Defendants continue to possess and operate a convenience store at the location of Store 22398. Defendants have admitted they intend to represent this store to the public as an authorized 7-Eleven franchise.

### III. LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (internal quotations and citations omitted). "The purpose of. . .a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (internal quotations omitted). To obtain a preliminary injunction, a plaintiff must establish that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the injury he will incur if injunctive relief is not granted will outweigh the harm which granting the injunctive relief

---

[8] The court notes that 7-Eleven presented no evidence to show they engaged in the mediation procedure described on pages 30 and 31 of their franchise agreement. The agreement explicitly states, however, that that this mediation is not mandatory. Therefore, this fact is not dispositive.

would inflict on defendants; and (4) public interest favors an injunction. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

### IV. 7-ELEVEN'S MOTION FOR PRELIMINARY INJUNCTION

On July 2, 2014, 7-Eleven moved for a preliminary injunction to (1) enjoin Defendants from further infringement of 7-Eleven's trademarks, and (2) enforce the non-compete clause of the franchise agreement, thereby preventing Defendants from operating a convenience store in Store 22398's location. (Dkt. No. 9.) For the reasons explained below, the court grants 7-Eleven's motion, insofar as it requests trademark-infringement relief. The court denies 7-Eleven's motion, insofar as it seeks to enforce the non-compete provision.

**A. 7-Eleven's Motion to Enjoin the Defendants from using its Trademarks**
   (1) <u>Likelihood of Success on the Merits</u>

In the context of preliminary injunctions for trademark infringement, the most important issue is whether the plaintiff is likely to succeed on the merits of its claim for injunctive relief. See Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006) (importance of the merits element of preliminary injunction analysis is "magnified in trademark cases"). 7-Eleven has met its burden under this prong by showing it was likely entitled to terminate the franchise agreement, and is entitled to enjoin Defendants' use of its trademarks.

One provision of the Franchise Agreement requires Defendants to prepare and furnish actual sales data by appropriate use of the POS system. Through the testimony of 7-Eleven's Corporate Investigator, Michael Aldridge, in conjunction with video surveillance footage presented at the evidentiary hearing, 7-Eleven demonstrated its termination of the franchise agreement was justified. The evidence supports a conclusion, at this stage, that Defendants intentionally misused the POS system and therefore failed to accurately prepare and furnish their sales data. 7-Eleven presented many examples of Defendants' failure to adequately or accurately input sales data,

6

including Defendants' numerous failures to enter sales into the POS system correctly and, in some cases, failure to enter sales entirely.[9] In this context, valid termination of the franchise agreement renders all use of trademarked materials impermissible. See, e.g., 7-Eleven v. Kapoor Bros., Inc., 977 F. Supp. 2d 1211, 1225-1228 (M.D. Fla. 2013) (defendants required to stop using 7-Eleven's trademarked materials after franchise agreement termination); 7-Eleven, Inc. v. Upadhyaya, 926 F. Supp. 2d 614, 617-618, 626 (E.D. Pa. 2013) (same).

If a franchisee continues to use a franchisor's trademarks for the benefit of his business after justified termination for breach of agreement, then the franchisor has the right to enjoin the unauthorized use of its trademark pursuant to the Lanham Act. See 15 U.S.C. § 1125(a); Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp. 2d 147, 158 (D. Mass. 2001). When a defendant does not dispute that a plaintiff owns the mark in question that the defendant utilizes, as is the situation here, the relevant inquiry becomes whether a defendant's use of the mark is likely to cause confusion among customers. See, e.g., Digital Equip. Corp. v. AltaVista Tech., 960 F. Supp. 456, 476 (D. Mass. 1997). In cases where the use of the franchisor's mark is uncontroverted, a likelihood of consumer confusion is presumed. See Curves Int'l, Inc. v. Fox, 2013 WL 1946826, at *2 (D. Mass. May 9, 2013) (consumer confusion presumed when former franchisee persisted in operating a business identical to that of the former franchisor).

Here, Defendants do not deny they continue to operate a business purporting to be a 7-Eleven franchise,[10] thereby necessitating the court's presumption that customers of this "rogue" establishment are likely to be confused. See id. 7-Eleven has met its burden of demonstrating that it is likely to succeed on the merits of its trademark infringement claim.

---

[9] The evidence presented at the evidentiary hearing indicated that Mr. Grewal was the primary perpetrator of this latter category of impermissible conduct.
[10] In fact, Defendants have moved for preliminary injunction, specifically so that they may continue to receive the full benefits of operating their convenience store as a 7-Eleven franchise. (Dkt. No. 22.)

7

(2) <u>Irreparable Harm Suffered</u>

"Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it." <u>Hypertherm, Inc. v. Precision Products, Inc.</u>, 832 F.2d 697, 700 (1st Cir. 1987). For that reason, in the trademark infringement context, the "irreparable harm" element is fulfilled if the aggrieved party "can show it is likely to prevail on the merits of its [trademark] infringement claims." <u>See</u> <u>Digital Equip. Corp.</u>, 960 F. Supp. at 472. For example, in <u>Curves Int'l v. Fox</u>, after finding the plaintiff was likely to succeed on the merits of the trademark infringement claim, the court presumed the former franchisee's operation of a "rogue" facility would cause irreparable harm to the franchisor unless injunctive relief was granted. 2013 WL 1946826, at *2 (franchisee "suffers harm to its goodwill and reputation, and is unable to protect its other franchises" from the actions of the "rogue" franchisee (citing <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d 27, 33 (1st Cir. 1998)).

Here, similar to the franchisor in <u>Curves, Int'l</u>, 7-Eleven will be unable to protect the quality of its brand in the absence of a consensual and ongoing franchisor-franchisee relationship. <u>See</u> 2013 WL 1946826, at *2. Since Defendants have admitted they continue to operate a convenience store as though it were a 7-Eleven franchise, it follows that 7-Eleven will suffer irreparable harm if relief is not granted. <u>See</u> <u>Digital Equip. Corp.</u>, 960 F. Supp. at 472.

(3) <u>Balancing of Harms</u>

Where adjudication on the merits is likely to reveal defendants' trademark infringement, harm to a defendant that flows from a preliminary injunction is typically entitled to less consideration than other harms for the purposes of the balancing analysis. <u>See</u> <u>Commerce Bank & Trust Co. v. TD Banknorth, Inc.</u>, 554 F. Supp. 2d 77, 88 (D. Mass. 2008); <u>see also</u> <u>Opticians Ass'n of America v. Independent Opticians of America</u>, 920 F.2d 187, 197 (3d Cir. N.J. 1990) (despite the inevitable costs associated with replacing trademark-bearing items, harm to infringing party does not

outweigh aggrieved trademark holder). Accordingly, an aggrieved plaintiff's claim is generally favored when a given defendant continues to use that plaintiff's brand following his objection. See Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 338 F. Supp. 2d 181, 190 (D. Mass. 2004) ("risk was assumed by [the defendant] when it continued to use its name following [the plaintiff's] objection").

Courts reviewing motions for preliminary injunctions for trademark infringement tend to lack sympathy for trademark-infringing defendants when the trademark infringement results from those defendants' "recalcitrant behavior." See, e.g., Opticians Ass'n of America, 920 F.2d at 197 (infringing party "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of the injunction upon itself"); Processed Plastic Co. v. Communications, Inc., 675 F.2d 852, 859 (7th Cir. 1982) (court explained that, after a defendant intentionally copied plaintiff's toy design, it "cannot now complain that having to mend its ways would be too expensive").

In balancing respective harms in this context, courts also consider the amount of time, money, and effort expended by the aggrieved party to promote its brand. See Calamari Fisheries, Inc. v. Village Catch, Inc., 698 F. Supp. 994, 1014 (D. Mass.1988) ("defendants have engaged in relatively little advertising or promotional efforts," whereas "plaintiff has engaged in extensive advertising and promotional activities over the past 15 years"); see also A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 909 (7th Cir. 1986) (affirming court's finding that the plaintiff's injury outweighed harm to defendant by balancing the plaintiff's 13 years of marketing, promotional efforts, and distributorship arrangements against the defendant's "minimal investment and promotional activities").

7-Eleven has met its burden on this prong, in large part because of its likelihood of success on the merits of the trademark infringement claim. See Commerce Bank & Trust Co., 554 F. Supp. 2d at 88. Also weighing in favor of 7-Eleven is that its termination of Defendants' right to use

9

trademarked material was due to Defendants' impermissible conduct; yet Defendants continued to use 7-Eleven's brand after they received notification of this termination. See Bay State Sav. Bank, 338 F. Supp. 2d at 190. Defendants have assumed the risk of any harm they may incur as a result of the court's granting of this motion. See id. Further, the court does credit Defendants' assertion they have expended eight years and significant money in pursuit of becoming a successful 7-Eleven franchisee, but these figures pale in comparison to the amount of time and effort expended by 7-Eleven in promoting and refining its brand. See Calamari Fisheries, Inc., 698 F. Supp. at 1014.

    (4)  Public interest

"Given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names," courts are in agreement that "[p]reventing consumer confusion is clearly in the public interest." Hypertherm, Inc., 832 F.2d at 700; see Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 820 (1st Cir. 1987) (purpose of protecting trademarks from infringement is to allow "the public to depend on the constancy of the quality of products it seeks"). Accordingly, when success on the merits of a trademark infringement claim is likely, motions to preliminarily enjoin use of these trademarks will serve the public interest. See Boustany v. Boston Dental Group, 42 F. Supp. 2d 100, 113 (D. Mass. 1999).

Here, as 7-Eleven is likely to succeed on the merits of its trademark infringement action, it follows that consumer confusion is likely to ensue if the motion for preliminary injunction is not granted. See Dunkin' Donuts, Inc., 139 F. Supp. 2d at 158 (D. Mass. 2001). Therefore, the public interest will be served by the enjoinment of Defendants' use of 7-Eleven's marks. See Boustany, 42 F. Supp. 2d at 113.

**B.  7-Eleven's Motion to Enforce the Franchise Agreement's Non-Compete Clause**

The Franchise Agreement contains a restrictive covenant which prohibits Defendants from maintaining, operating, or engaging in a competitive business located at the site of Store 22398 for one year after the agreement's termination. Due to its valid termination of the franchisor-franchisee relationship, 7-Eleven now seeks to preliminarily enjoin Defendants from operating any convenience store at 539 Pleasant Street.[11] Finding that 7-Eleven has not met its burden with respect to the harms-related prongs of the preliminary injunction analysis, the court denies this portion of its motion for preliminary injunction.

(1) Likelihood of Success on the Merits

Since Defendants have admitted they continue to run a convenience store at the location of the former 7-Eleven, it follows that Defendants are likely in violation of this restrictive covenant. Therefore, if the court finds that the non-compete clause is likely to be deemed reasonable upon an adjudication on the merits, it must also find that 7-Eleven has met its burden on this prong of the preliminary injunction analysis.

In Massachusetts, "a covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." Boulanger v. Dunkin' Donuts, Inc., 815 N.E.2d 572, 577 (Mass. 2004). Applying these factors, the District of Massachusetts found a post-termination prohibition on a defendant's operation of any similar facility within ten miles of the location of another one of the plaintiff's franchise establishments to be reasonable. Curves Int'l, Inc., 2013 WL 1946826, at *2. 7-Eleven's post-termination non-compete agreement is far less restrictive than the covenant evaluated in Curves Int'l because it only seeks to prohibit Defendants from operating a competitive business

---

[11] In its memorandum, 7-Eleven also argues that Defendants are in breach of their post-termination obligations by continuing to "offer the same products and services as before termination of the Franchise Agreement, and consequently, continu[ing] to use 7-Eleven's confidential information in violation of the restrictive covenants." (Dkt. No. 10, 7-Eleven's memorandum of law 15.) The court interprets this secondary issue as one that will realistically be resolved if Defendants are enjoined from using Plaintiff's marks.

11

located at the exact site of the terminated franchise store. See id. This court concludes 7-Eleven is likely to succeed on the merits of its injunction to enforce this restrictive covenant.

(2) Irreparable harm

Unlike the preliminary injunction analysis for trademark infringement, a presumption of irreparable harm does not automatically follow from a finding that a plaintiff is likely to succeed on the merits of its motion to enforce a non-compete agreement. See Singas Famous Pizza Brands Corp. v. New York Adver. LLC, 468 Fed. Appx. 43, 46 (2d Cir. N.Y. 2012) (rejecting proposition that irreparable harm must inevitably be assumed in breach of covenant cases). Therefore, though the court acknowledges 7-Eleven's restrictive covenant will probably be deemed enforceable, it is not clear that delaying the enforcement of this covenant will cause 7-Eleven irreparable harm. See Winter, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (emphasis added).

Specifically, when the value of one (or even two) year(s) of lost profit from one of 7-Eleven's 50,000 worldwide franchise establishments is viewed in proportion to the company's total annual profit, the losses would likely be miniscule. Additionally, denying this portion of 7-Eleven's preliminary injunction certainly would not cause it to lose its indisputably competitive position in the market. See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 356 F.3d 1256, 1263-1264 (10th Cir. Colo. 2004) (observing that "irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position"). A denial also would not cause 7-Eleven's brand to lose any goodwill in the community. Customers would have no reason to associate Defendants' convenience store with the 7-Eleven brand after 7-Eleven's marks are removed from

the premises, assuming Defendants' convenience store continues to operate in accord with this order. See id. Finally, a denial would not render it impracticably difficult to calculate 7-Eleven's damages at a subsequent adjudication on the merits. See id.; Grease Monkey Int'l v. Ralco Lubrication Servs., 24 F. Supp. 2d 120, 125 (D. Mass. 1998) (financial harm aggrieved franchisor might suffer is not irreparable because it is "ordinarily compensable").

(3) <u>Balancing of Harms</u>

7-Eleven also has not demonstrated that the harm it will suffer, if injunctive relief is not granted, will outweigh the harm which granting the injunction would inflict on Defendants. See Winter, 555 U.S. at 22 (for a plaintiff to prevail on a motion for preliminary injunction, a clear showing of success on each element is required). When a former franchisor ultimately prevails on the merits in this context, its damages are approximately measurable and therefore compensable. See Grease Monkey Int'l, 24 F. Supp. 2d at 125. By contrast, if a preliminary injunction is granted which effectively forces a former franchisee out of his business, that franchisee has suffered considerable, if not irreparable, harm. See id. (defendant's "ability to earn a living in his chosen field would be extinguished or at least substantially curtailed if he were enjoined"); see also RE/MAX of New England, Inc. v. Prestige Real Estate, Inc., 2014 WL 3058295, at *4 (D. Mass. July 7, 2014) ("Taking the motion as a whole, the balance of the hardships and the public interest both weigh heavily in favor of the defendants…If enjoined, they would effectively have to go out of business.").

While the court can not speculate as to an exact figure of monetary loss that 7-Eleven might incur if Defendants continue to operate a convenience store at Store 22398's location during the litigation, the resulting lost profit to the 7-Eleven corporation from its temporary lack of ability to operate one of its 50,000 store locations is not significant when compared to the harm that

13

Defendants would suffer.[12] See RE/MAX of New England, Inc., 2014 WL 3058295, at *4. In order to start her business as a 7-Eleven franchisee, Mrs. Grewal explained she invested over one hundred thousand dollars, and that this amount was a very significant portion of her personal capital. 7-Eleven did not offer any evidence to contradict this testimony. The court credits Defendants' assessment of the degree of financial hardship they will inevitably undergo if ousted from their convenience store. Therefore, the balance-of-harms analysis weighs in favor of Defendants.[13] See id.

The court acknowledges the District of Massachusetts came to a different conclusion on this issue, when presented with marginally similar facts, in Curves Int'l. See 2013 WL 1946826. This court, however, does not find that the holding and rationale in Curves Int'l, relative to the non-compete clause analysis, is applicable in this case. See Curves Int'l, Inc., 2013 WL 1946826, at *2. Specifically, the Curves Int'l court did not separate its discussion of trademark infringement from its discussion of preliminary enforcement of the non-compete agreement.[14] See id. As a result, there was no consideration as to the rogue fitness franchise facility in question continuing to operate as an

---

[12] Though the court, to some degree, credits 7-Eleven's argument regarding the increased difficulty of salvaging the profitability and consumer goodwill of the store located at 539 Pleasant Street if the preliminary injunction is not granted, this potential for increased difficulty still does not outweigh potential harm to Defendants if the preliminary injunction is granted. See RE/MAX of New England, Inc. v. Prestige Real Estate, Inc., 2014 WL 3058295, at *4 (D. Mass. July 7, 2014).

[13] While it did not consider a motion to preliminarily enforce a non-compete agreement, this approach derives support from the Calamari Fisheries, Inc. v. Village Catch, Inc. balancing-of-harms discussion, which emphasized the significance of the plaintiff's merely moving to enjoin defendant from using its mark and not moving to stop the defendant from doing business all together at the location. See 698 F. Supp. 994, 1015 (D. Mass. 1988) (granting preliminary injunction for trademark holder).

[14] The Curves Int'l, Inc. v. Fox court first concluded the covenant not to compete was reasonable, and therefore that the plaintiff was likely to succeed on the merits (similar to this court's conclusion here). See 2013 WL 1946826, at *1-2 (D. Mass. May 9, 2013). Next, however, when analyzing the irreparable harm element, the Curves Int'l court applied law pertaining to motions to preliminarily enjoin trademark infringement, as opposed to opinions analyzing covenants not to compete in this context. See id. ("Because Curves has demonstrated that it is likely to succeed in establishing trademark infringement, it is presumed that Fox's operation of a rogue Curves fitness facility will cause irreparable harm to Curves unless injunctive relief is granted." (citing I.P. Lund Trading ApS v. Kohler Co. 163 F.3d 27, 33 (1st Cir. 1998) (reviewing district court decision pertaining only to a motion to enjoin trademark infringement)). Contrary to the Curves Int'l rationale supporting this aspect of its decision, irreparable harm should only be presumed in the context of trademark infringement; and not in the context of covenant-not-to-compete enforcement. See Singas Famous Pizza Brands Corp. v. New York Adver. LLC, 468 Fed. Appx. 43, 46 (2d Cir. N.Y. 2012) (rejecting proposition that irreparable harm must inevitably be assumed in breach of covenant cases). The Curves Int'l court also applied law pertaining only to preliminary injunctions for trademark infringement in its analysis of the balancing-of-harms prong. See 2013 WL 1946826, at 2 (citing Robert J. Fritz, DMA, Inc. v. Arthur D. Little, Inc., 944 F. Supp. 95, 97-98 (D. Mass 1996) (decision pertaining only to the merits of a motion to preliminarily enjoin use of trademark)).

unaffiliated fitness facility in the same location while litigation was pending, so as to minimize the harm the former franchisee would suffer prior to adjudication on the merits. See id.

Additionally, this court recognizes that the District of Florida has come to a different conclusion with very similar facts, see 7-Eleven, Inc. v. Kapoor Bros., Inc., 977 F. Supp. 2d 1211 (M.D. Fla. 2013);[15] however, the notion of granting a motion for preliminary injunction for trademark infringement while simultaneously denying that motion for enforcement of a restrictive non-compete covenant is not wholly unique. For example, in Prosperity Sys., Inc. v. Ali, the court found the balance of harms tipped in favor of the plaintiff-franchisor on its trademark infringement claim, but ruled the non-compete clause should not be preliminarily enforced because it would cause the defendant-franchisee to "lose his business and be unable, at least for some period of time, to support himself or his family." 2010 WL 5174939, at *6 (D. Md. Dec. 15, 2010); see also Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 890 (8th Cir. Minn. 2013) (affirming district court's denial of plaintiff's preliminary injunction to enforce the franchise agreement's non-compete clause as part of the preliminary injunction because plaintiff did not show "that the balance of the harms or the public interest weighs against allowing [former franchisee] to continue to operate his business without [the former franchisor's] marks or products," even though court granted motion to enjoin further trademark infringement.).

(4) Public Interest Considerations

The public interest weighs in favor of granting 7-Eleven's request to enforce the non-compete clause. While the prospect of causing Defendants' business to close is certainly a compelling factor in this prong of the preliminary injunction analysis, the reality is that Defendants

---

[15] In finding for 7-Eleven on the harms-related prongs of 7-Eleven's motion to enforce the franchise agreement's non-compete agreement, the 7-Eleven, Inc. v. Kapoor Bros., Inc. court based its decision upon Fla. Stat. § 542.335, which creates a presumption of irreparable harm when restrictive covenants are violated, and which also "prohibits the court from considering individualized economic or other hardship that might be caused to the person against whom enforcement is sought" when determining the enforceability of a restrictive covenant. See 977 F. Supp. 2d 1211 (M.D. Fla. 2013) (citing Fla. Stat. §§ 542.335(1)(g)(1) and (1)(j)). Massachusetts does not have a similar statute.

have not compensated 7-Eleven for the use of the premises since the termination of the Franchise Agreement several months ago, and further, they may be unable to pay 7-Eleven any amount of rent from this point forward. See Castillo v. Skoba, 2010 U.S. Dist. LEXIS 112004 (S.D. Cal. Oct. 21, 2010) (public interest does not favor the notion of allowing the plaintiff to live rent-free until the termination of his case). Similarly, given the court's ruling on the trademark infringement portion of 7-Eleven's motion for preliminary injunction and the likelihood of 7-Eleven's success on the merits of both claims, it would be unfair for 7-Eleven to bear the costs associated with removing its marks from Store 22398 if Defendants continue to operate an unaffiliated convenience store in its location while litigation is pending. See Bay State Sav. Bank, 338 F. Supp. 2d at 190 ("risk was assumed by [defendant] when it continued to use its name following [the plaintiff's] objection"); see also Opticians Ass'n of America, 920 F.2d at 197 (3d Cir. N.J. 1990) (despite the inevitable costs associated with replacing trademark-bearing items, harm to infringing party does not outweigh harm to aggrieved trademark holder).

The court recognizes the likelihood that granting 7-Eleven's motion to enjoin Defendants' use of its trademark will make it very difficult for Defendants to continue to operate a convenience store on the premises.[16] The court's ruling does, however, theoretically allow Defendants to continue their business as an unaffiliated convenience store (without 7-Eleven's marks or assistance), but only if an agreement pertaining to rent, insurance, equipment loan, costs associated with removal of trademarks, and other concerns pertaining to a temporary commercial lease can be reached by the parties.[17]

---

[16] At the hearing, the Defendants discussed at length their store's growing inability to function without 7-Eleven's assistance, even while they have continued to operate without properly compensating 7-Eleven for rent, insurance, or any other related costs since June of 2014.

[17] The court further notes that this ruling does not preclude 7-Eleven from pursuing other remedies under federal or state law, such as eviction. See Section V, infra, for a more detailed discussion.

16

Additionally or alternatively, the court will consider a request by either party to schedule a trial in an expedited matter so the parties can fully litigate the matter in a timely fashion.

**C. Bond**

While not considered to be a mandatory prerequisite to the issuance of a preliminary injunction in the First Circuit, see Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988), the court may, in its discretion, require that a successful preliminary injunction movant post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65.

Accordingly, here, the court will condition its partial grant of 7-Eleven's motion for preliminary injunction upon 7-Eleven's posting of a 150,000 dollar bond.[18] See id. If 7-Eleven does not succeed on the merits of its trademark infringement claim, Defendants will be entitled to this sum in order to compensate them for damage sustained as a result of this ruling. See id.

### V. DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

Defendants have moved for a preliminary injunction which, if granted, would have the effect of forcing 7-Eleven to continue to fulfill its obligations to Defendants under the Franchise Agreement, including allowing Defendants to continue to utilize 7-Eleven's trademarked materials for the purposes of their business. (Dkt. No. 22.) Since 7-Eleven has demonstrated that it is likely justified in terminating its contract with Defendants, and since the court is granting 7-Eleven's motion to enjoin use of its trademarks, it follows that the Court will deny Defendants' motion.

In their motion, Defendants have also asked the court "to enjoin the plaintiff from taking any measures to evict the defendants at their store located at 539 Pleasant Street, Holyoke, Massachusetts." (Dkt. No. 22 ¶(f).) This provision of Defendants' motion can be interpreted in one

---

[18] During the hearing, 7-Eleven offered to post a 100,000 dollar bond. The court believes that, under these circumstances, 150,000 dollars is a more appropriate figure. See Fed. R. Civ. P. 65; Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988).

17

of two ways, as it is unclear whether Defendants are referring to this specific litigation in which "eviction" constitutes one count of the complaint (Dkt. No. 1); or, alternatively, to the potential for 7-Eleven to initiate parallel eviction litigation in state court. Regardless of Defendants' intended meaning, the court denies the request.

In the first alternative, denial is appropriate because a preliminary injunction motion is not the proper procedural vehicle for Defendants to request that one of 7-Eleven's claims be dismissed. See Fed. R. Civ. P. 12. In the latter alternative, denial is appropriate because this court is unwilling to control state adjudicatory actions in the manner requested by Defendants. See Younger v. Harris, 401 U.S. 37, 45 (1971) ("the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions"); see also Seidel v. Wells Fargo Bank, N.A., 2012 WL 2571200, at *2 (D. Mass. July 3, 2012) ("Evictions are complex proceedings governed extensively by state law that implicate important interests of the state and its citizenry," and federal courts have routinely held that they are barred from enjoining state-court eviction proceedings.). Furthermore, one's right to access the courts is a fundamental. See Ellis v. Viles, 2010 WL 6465282, at *3 (D. Mass. Aug. 26, 2010) report and recommendation adopted 2011 WL 1344551 (D. Mass. Mar. 3, 2011) ("access to the courts" is a constitutional right). For these reasons, the court will deny this request.

## VI. CONCLUSION AND ORDER

For the reasons set forth above, the court:

(1) Grants 7-Eleven's motion for preliminary injunction, insofar as it seeks to enjoin Defendants from utilizing its trademarks. Defendants are therefore prohibited from continuing to use, or otherwise infringing upon, any of 7-Eleven's marks, including 7-Eleven, Big Gulp, Slurpee, or any confusingly similar trademark, service mark, logo, or trade name, at least until adjudication on the merits of 7-Eleven's action is complete.

(2) <u>Denies 7-Eleven's motion for preliminary injunction, insofar as it requests enforcement of the franchise agreement's "non-compete clause" prior to an adjudication on the merits.</u>

(3) <u>Denies Defendants' motion for preliminary injunction in its entirety.</u>

It is So Ordered.

    /s/ Mark G. Mastroianni    
MARK G. MASTROIANNI
United States District Judge